# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v.  ) | Case No: 1:20-mj-84(TCB) |
| ) | |
| **JOHN CAMERON DENTON** ) | |
| ) | |
| **Defendant.** ) | |

### RESPONSE TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE DETENTION ORDER

COMES NOW the Defendant, John Cameron Denton ("Mr. Denton"), by counsel, and submits this response to the government's opposition to our motion to revoke the detention order.

### BACKGROUND

Undersigned counsel filed the Motion to Revoke Detention Order on March 25, 2020, and the government responded the following day on March 26. That same day Attorney General Barr issued a directive ordering the Bureau of Prisons to prioritize home confinement.[1] On April 4, 2020, the government filed a motion requesting an extension of time to indict which was granted, over the defendant's objection, extending the time to indict until June 25, 2020. As a result, the time to indict was extended by approximately 3 months. This is much greater than the 15-day extension that was in place at the time the original motion was filed. The length of the extension also magnifies the prejudice placed on Mr. Denton by the jail's 30 minute attorney video conferencing protocol.

---

[1] This directive is available at https://www.justice.gov/file/1262731/download (last visited Apr. 1, 2020).

**ARGUMENT**

**I.     The Conditions of Release Will Assure the Safety of the Community**

Even in the absence of the COVID-19 crisis, the conditions that accompanied the recommendation for release made by Pre-Trial Services are sufficient to reasonably assure the safety of the community. These conditions include 24-hour home confinement with electronic monitoring, a third-party custodian, and no access to electronic devices with internet capabilities. In its opposition, the government speculates that if released Mr. Denton would continue to conspire with Atomwaffen Division members and associates. However, in the month prior to his arrest Mr. Denton did not pursue any of the behavior the government suggests would continue if he were released. In fact, on March 14, 2020, it was announced that Atomwaffen Division was disbanding.[2] In two related cases in the Western District of Washington, Taylor Parker Dipeppe and Johnny Garza (2:20cr32), both of whom were members of Atomwaffen Division, were released to third-party custodians. In fact, Mr. Parker Dipeppe was released to an out of state third-party custodian. Their other conditions are similar to those recommended for Mr. Denton. (Exhibit 1 & 2)

Contrary to the government's view, the conditions would ensure the safety of the community because they prevent his access to electronic devices which were a necessary implement in the alleged offense. The purpose of a third-party custodian is to ensure that a defendant abides by the terms of their release. Mr. Frank Denton is ideally situated to do so. He is able to provide around the clock supervision of Mr. Denton. He is also able to ensure that Mr. Denton does not have access to electronics. (Exhibit 3 & 4) Home detention with electronic monitoring would provide an additional layer of assurance the Mr. Denton is not accessing

---

[2] See https://www.counterextremism.com/blog/atomwaffen-division-claims-have-disbanded

electronic devices at other locations. If Mr. Denton is allowed to leave his grandfather's residence to work, then his employer will also ensure that he does not access electronic devices. (Exhibit 5) It is also important to note that after two months, the allegations related to child pornography remain completely unsubstantiated beyond the claims of two individuals.

## II. Ongoing COVID-19 Crisis

In addition to the sufficiency of the release conditions, the development of the COVID-19 crisis suggest that transfer to home detention is appropriate. The spread of COVID-19 has led the President of the United States to declare a national emergency.[3] The declaration reflects, among other factors, the ease with which the disease spreads, the fact that those who have the disease may not even realize it, shortages of tests to determine who has the disease, severe consequences for citizens with certain medical backgrounds, and current and projected shortages of equipment and personnel able to treat victims of the virus.[4]

---

[3] President Donald J. Trump, "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak" (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited Apr. 1, 2020).

[4] *See generally,* Center for Disease Control, "Coronavirus Disease 2019 Basics" webpage, *available at* https://www.cdc.gov/coronavirus/2019-ncov/faq.html#anchor_1584386215012 (last visited Apr. 1, 2020) ("The virus that causes COVID-19 seems to be spreading easily and sustainably in the community ('community spread') in some affected geographic areas. Community spread means people have been infected with the virus in an area, including some who are not sure how or where they became infected."); *id.* ("Older adults and people of any age who have serious underlying medical conditions may be at higher risk for more serious complications from COVID-19. . . . you are at higher risk of getting very sick from COVID-19, you should: stock up on supplies; take everyday precautions to keep space between yourself and others; when you go out in public, keep away from others who are sick; limit close contact and wash your hands often; and avoid crowds, cruise travel, and non-essential travel. If there is an outbreak in your community, stay home as much as possible."); i*d.* ("State and local public health departments have received tests from CDC while medical providers are getting tests developed by commercial manufacturers. While supplies of these tests are increasing, it may still be difficult to find someplace to get tested. See Testing for COVID-19 for more information."); Trump, "Proclamation," *supra* ("The spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems.").

Public health officials are urging people to "socially distance" themselves from others and routinely disinfect surfaces which is nearly impossible to accomplish while incarcerated.[5] Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[6] As several courts have acknowledged, citing experts including the CDC, "correctional and detention facilities 'present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors.'" *United States v. Kennedy*, Case No. 18-20315, Case No. 2020 WL 1493481 at *2 (E.D. Mich. Mar. 27 2020)(quoting CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities")(Mar. 23, 2020)).[7] "These include: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing)." *Id.; see Davis* Mem. Op.at 7("[s]ocial distancing in a pretrial facility is nearly impossible for anyone who enters its doors, especially detainees.").

These factors make "'transmission of COVID-19 more likely" within jail. *Id.* (quoting Mar. 25, 2020 Ltr. from Johns Hopkins Faculty to Gov. Hogan ("Hopkins Faculty Ltr."[8]); *see also id.* at 7 n.3 (citing *United States v. Harris*, Case No. 19-356, 2020 WL 1482342, at*1

---

[5] Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, The New York Times (March 18, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisonsjails.html
[6] Joseph A. Bick (2007). Infection Control in Jails and Prisons. Clinical Infectious Diseases 45(8):1047-1055, at https://doi.org/10.1086/521910.
[7] The CDC guidance quoted by the District of Michigan is available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html [hereinafter "CDC Guidance3/23/2020"].).
[8] This is available https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf.

(D.D.C. Mar.26, 2020) ("The risk of the spread of the virus in the jail is palpable"); *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at*5 (S.D.N.Y. Mar.26, 2020) ("The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious."); *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) ("[I]t is not possible for a medically vulnerable inmate to isolate himself in [an] institutional setting as recommended by the CDC.")); *see also United States v. Barkman*, No. 19-cr-52-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628, at *3 (D. Nev. Mar. 17, 2020) ("Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease."). As of April 7, 2020, the number of COVID-19 cases in the BOP was increasing at a rate of 15,550 percent compared to a national rate of 1,963 percent.[9]

---

[9] See https://federaldefendersny.org/



Consistent with these concerns, the Attorney General has issued a directive ordering the Director off the Bureau of Prisons to "prioritiz[e] home confinement as appropriate in response to the COVID-19 pandemic...to protect the health and safety of BOP personnel and the people in our custody." Att'y Gen., Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, (Mar. 26, 2020)[10]

Moreover, the risk presented by the virus is present in every detention facility *now*, notwithstanding the absence of reported cases at those facilities. For example, the undersigned is not aware that anyone who works or is detained at the Alexandria Detention Center, where Mr.

---

[10] This directive is available at https://www.justice.gov/file/1262731/download (last visited Apr. 1, 2020).

Denton is housed, has tested positive for the virus.  However, rumors are swirling through the courthouse that an AUSA, U.S. Marshall and CSO have all tested positive within the last week.  The virus could enter and begin to spread in the jail before we know it and based on the rate of spread in the BOP, it will spread faster in the ADC than the community.  The Director of the CDC recently warned that up to 25 percent of people infected with COVID-19 "may not show symptoms[.]" Apoorva Mandavilli, "Infected but Feeling Fine: The Unwitting Coronavirus Spreaders," *New York Times* (March 31, 2020).  This makes the protocols put in place by the Alexandria Sheriffs Office and referenced by the government completely useless.

Upon his transfer to home detention, the Mr. Frank Denton, Mr. Denton's grandfather, would drive or fly to Alexandria, Virginia, to pick-up Mr. Denton and return him home to Montgomery County where both would self-quarantine for two weeks.  Of course, the Denton family is able to accommodate any other concern or requirement that the Court may have with this process.

Furthermore, as was referenced in the original motion, effective March 23, 2020, all attorney client meetings will be conducted by video conferencing limited to 30-minute time slots.  Even with Mr. Denton transferred to home detention in Texas, it will be much easier to prepare for trial and communicate with him compared to navigating the jail video conferencing in 30-minute increments.  The Denton family is also available to accommodate any travel requirements for necessary in person meetings with counsel.

## CONCLUSION

The conditions that accompanied the Pre-Trial Services recommendation for release are more than sufficient to reasonably ensure, if not guarantee, the safety of the community.  In light of the lengthy extension of time to indict that was granted to the government and the uncertainty

and danger surrounding the COVID-19 crisis, it is no longer appropriate to detain Mr. Denton in the jail.  It is simply not possible for counsel to maintain meaningful communication with Mr. Denton under the jail protocols, while his case is at a standstill.

Accordingly, the defense respectfully requests that this Court revoke the detention order issued in this case and transfer Mr. Denton to home detention with electronic monitoring and a third-party custodian along with the other conditions outlined with Pre-Trial Services release recommendation.

> Respectfully submitted,
> John Cameron Denton
> By Counsel
>
>
> By:  /s/ *Andrew M. Stewart*          .
> Andrew M. Stewart, Esq., VSB# 68683
> Dennis, Stewart & Krischer pllc
> 2007 15th Street North, Suite 201
> Arlington, VA 22201
> Phone: 703-248-0626
> Fax: 703-248-8971
> andrew.m.stewart.esq@gmail.com

CERTIFICATE OF SERVICE

       I hereby certify that on the 8th day of April, 2020, I electronically filed the foregoing motion with the clerk of the court using the CM/ECF system, which will send an electronic copy to the following:

Carina Cuellar
Assistant United States Attorney
U.S. Attorney's Office, Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314

                By: /s/ *Andrew M. Stewart* .
                Andrew M. Stewart, Esq., VSB# 68683
                Dennis, Stewart & Krischer pllc
                2007 15th Street North, Suite 201
                Arlington, VA 22201
                Phone: 703-248-0626
                Fax: 703-248-8971
                andrew.m.stewart.esq@gmail.com